## Case No. 10,013.

### The NAPOLEON.

[Blatchf. Pr. Cas. 357.] [1]

District Court, S. D. New York. May, 1863.

PRIZE — VIOLATING BLOCKADE — INSTRUCTIONS — ACTUAL INTENTION—REHEARING.

1. Rehearing, on further proofs furnished by the claimant of seven-eighths of the vessel.

2. One-eighth of the vessel being condemnable in any event, the libellants have a right to enforce their remedy against her as an entirety, whether they retain or remit the proceeds.

3. In the case of a vessel seized as prize by reason of her having violated a blockade, or been used by the enemy for warlike purposes, it is of no consequence that she was so employed without the knowledge or approbation of her owner.

[1] [Reported by Samuel Blatchford, Esq.]

4. In time of war, a neutral vessel is subject to forfeiture if run into a blockaded port by her commander, independently of proof of instructions by or actual intention on the part of her owner to evade the blockade, he having previous due notice of its existence and efficiency.

The former decision in this case [Case No. 10,012] confirmed for these reasons: 1. The vessel entered the port where she was captured, by violating the blockade. 2. One-eighth of the vessel was enemy property, lawfully seized in the enemy's country, in actual battle, by the United States military forces. 3. The remaining seven-eighths of the vessel, if legally the property of the claimant, is subject to forfeiture for holding commercial intercourse with the rebel states.

BETTS, District Judge. This case comes before the court, by consent of the counsel for both parties, in effect as upon a rehearing on further proofs, but without the formality of an issue on pleadings and proofs following the first hearing, and the decision on the libel, and the evidence taken in preparatorio. In that state of the proceedings, the vessel was condemned, as lawful prize of war, in December term last. It thus clearly belongs to the claimant to show, by further proofs, collated with such as shall be given by the libellants, that the vessel is not guilty of the offence charged in the libel. This burden the claimant assumes on his side, and insists that he has fulfilled it in the affidavits produced and read in his behalf; while the libellants contend that the weight of evidence, direct and presumptive, remains against the claimant, unchanged, and justifies the condemnation rendered. The Vigilantia, 1 C. Rob. Adm. 1; Harmony v. U. S., 2 How. [43 U. S.] 210.

It appears that the vessel was originally owned by a resident of North Carolina, who, in September, 1860, conveyed seven-eighths of her to the claimant, in satisfaction of a debt secured to him on that vessel. The vendor retained the possession and use of her subsequently, on different voyages, until he finally returned with her into port, in August, 1861; and it is not shown that his possession was afterwards changed until her capture by the libellants. It is to be remarked, that no legal exception is taken against the condemnation of one-eighth of the vessel. That portion of the decree must, therefore, stand unaffected by this rehearing; and the lien or special interest of the claimant in the residue of the vessel, if established, does not intercept or qualify the right of the United States to enforce its remedy against the vessel as an entirety, whether they retain or remit the whole proceeds involved in the condemnation.

The question before the court on this trial is as to the innocency or guilt of the vessel, as if the transaction in which she was implicated was one of personal violation on her part; and that inquiry may be resolved quite independently of the individual intentions or cognizance of the parties who are made pecuniarily responsible for acts of the vessel or of the property, which incur or have imputed to them forfeitures because of such acts. It is, accordingly, not sufficient for the claimant, in defence of this suit, to establish his own loyalty of character, and his disapproval of the connection of the vessel with the enemy, or with the illicit conduct alleged against her. The evidence on the first hearing was amply satisfactory in that respect, without the corroboration of subsequent proofs, which also show his unquestioned patriotism and rectitude as a citizen and a merchant, and that his most earnest efforts were exerted to prevent the prize from being in any way employed in aid of the enemy. But, notwithstanding his individual integrity, the vessel is responsible, in law, in rem, for the malfeasance of the agent who had control of her, in violating the penal laws of navigation. The most distinguished and unblemished reputation on the part of a ship-owner will not protect his vessel from confiscation, when it is engaged, though through untrustworthy agents, and without his knowledge, and against his prohibition, in illicit employments, in infractions of revenue and fiscal laws, and, pre-eminently, in violating the laws of war. The res culpabilis has meted out to it the mulct or confiscation legally applicable to an agent acting voluntarily in violation of law. Ships and cargoes of the largest values are constantly subject to forfeiture, without regard to the intentions of their owners, for being the means of smuggling property of trifling value into port, in evasion of restrictive laws of trade; and, in time of war, a neutral ship is subject to forfeiture if run into a blockaded port by her commander, independently of proof of instructions by or actual intention on the part of the owner, to evade the blockade, he having previous due notice of its existence and efficiency. In this case, no necessary intendment of law can arise, that the vessel, after the execution of a bill of sale of her to the claimant, was tortiously perverted from the possession and use of the claimant, nor that she did not remain with her original owner, and at his order, with the assent of the claimant. In this posture of the case, if the further proofs produced should establish all the facts alleged in respect to the equipment and acts of hostility charged against the prize vessel within the waters of North Carolina, they would fail to exonerate her from the decree of condemnation rendered against her on the first hearing; because she was, in fact, partly enemy property, and stationed in an enemy port, and was captured during an actual attack on such port by the United States forces, whilst it was defended by the military power of the enemy, and by the presence of the captured vessel; and, also, because the interest of the claimant in the vessel, entire or fractional, is confiscable under the general prize law, and by special enactments of congress, because

the vessel had commercial intercourse with an enemy port. Chit. Law Nat. 1; 12 Stat. 257, §§ 5, 6; Id. 319, § 1.

The particular point to which the further proof was prayed and offered by the claimant is, to show that the evidence in preparatorio was misapprehended by the court, or was grossly inaccurate in itself, so far as respects any illicit conduct of the vessel in aid of the enemy, and, most essentially, in the representation that she bore arms, or was in any way in a condition, at the time of her capture, to help the enemy in attacking the United States forces, or in defending the place they were assailing. To this end, various affidavits have been put in by the respective parties, taken ex parte, in North Carolina, since the decision of the cause on the first hearing. In most instances they are very loose, and wanting in precision in their statements and structure, and are subject to distrust, in being a literal repetition, by different witnesses, of facts ascertained by them at separate times and distant places, and without concurrent examinations. The prominent purpose aimed at by the claimant, in these proofs, is to contradict or countervail the evidence in preparatorio tending to prove that, when the vessel was captured, she was abandoned by all hands, leaving only her arms on board, which consisted of three 24-pounder guns and one 32-pounder, which were taken out of her by Captain Rowan, commander of the squadron, and put on shore at Newbern; and, by the testimony now offered, to disprove that the prize was armed and had artillery on board when captured. It does not appear to me that that fact is in any way material to the issue on trial, any further than as it may bear upon the credibility, in a general point of view, of the witnesses who give the evidence. The criminality of the vessel would be more certainly manifested if, when captured, she was fitted, manned and armed as a vessel-of-war, and was, in that way, taking part with the enemy; but she would be no less guilty and confiscable if she united in aiding and promoting the cause of the rebels against the government, otherwise than with arms and soldiers on board. Every act of intentional aid and assistance to the enemy, in whatever manner rendered by means of the vessel, would be visited upon her as an agent de facto in the offence, by the same consequences of condemnation and forfeiture as if it were committed by aggressive force and open hostilities. It, therefore, becomes of small moment to weigh critically the testimony with respect to the state of the vessel, in point of armament, at the instant of her capture; and it is a reasonable and fair interpretation of the affidavits given on both sides, except in two instances only, that the deponents speak of matters which must be derived from and known to them by general repute or belief, as having occurred within their personal knowledge, because it nowhere appears that they were members of

the ship's company, or individually on board of her during the time she was within the waters where she was captured, or had been so since the war commenced. This circumstance is not adverted to as detracting from the general title of the witnesses to credit, but to mark the character of the evidence, as founded upon what the parties regarded as true according to common acceptation and belief, without assuming to assert it to be correct of their individual knowledge.

Admitting, then, to the fullest extent, the probity of the claimant in all his personal transactions in respect to the vessel and her voyages, and his loyalty and fair conduct towards the laws and rights of his own government, so far as his personal intentions or authority were concerned, the considerations set up and pressed in his behalf cannot be admitted as constituting a legal defence to the suit. They may supply a forcible ground of appeal to the executive department of the government, in respect to the ulterior disposition of the proceeds of the prize, but the judiciary have no competency to control that matter. In my judgment, therefore, the former decree in the suit must stand and be executed; because the court must judicially recognize that, in August, 1861, when it appears the vessel entered the ports of North Carolina, they were in a state of efficient blockade, publicly notified, and continued so to the time of the arrest of the vessel; because one-eighth of the vessel was enemy property, lawfully seized in the enemy country, in actual battle, by the United States military forces; and because the remaining seven-eighths of the vessel, if legally the property of the claimant, is subject to forfeiture for holding commercial intercourse with a rebel state. Decree accordingly.

An appeal from this decree was taken to the supreme court [case unreported]. Subsequently the secretary of the treasury released seven-eighths of the vessel to the claimant, and the appeal as to the rest was abandoned.